Slip Op. 11-109

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES,                          :

                      Plaintiff,      :

                             :

        v.                              :      Before: Richard W. Goldberg

                             :              Senior Judge

                             :

GREAT AMERICAN INSURANCE            :

CO. OF NY,                              :      Court No. 09-00187

                             :

       and                             :

                             :

WASHINGTON INTERNATIONAL            :

INSURANCE CO.,                          :

                             :

                 Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>OPINION</u>

[Plaintiff's motion for summary judgment is granted in part, denied in part.  Defendant's cross-motion for summary judgment is granted in part, denied in part.]

Dated: August 31, 2011

    <u>Tony West</u>, Assistant Attorney General; <u>Barbara S. Williams</u>, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Amy M. Rubin</u>), Office of Assistant Chief Counsel for the U.S. Customs and Border Protection (<u>Joseph M. Barbato</u> and <u>Andrew G. Jones</u>), Of Counsel, Office of Chief Counsel for the International Trade Administration, U.S. Department of Commerce (<u>Joanna Theiss</u>) Of Counsel, for the plaintiff.

    <u>Crowell & Moring LLP</u> (<u>Mark D. Plevin</u>, <u>Theodore R. Posner</u>, and <u>Alexander H. Schaefer</u>), for defendant, Great American Insurance Company of New York.

    <u>Sandler, Travis, & Rosenberg, P.A.</u> (<u>Thomas Randolph Ferguson</u> and <u>Arthur K. Purcell</u>), for defendant, Washington International Insurance Company.

GOLDBERG, Senior Judge:  Before this Court are cross-motions for summary judgment submitted by Plaintiff United States (the "Government") and Defendants  Great American Insurance Company of New York ("Great American")[1] and Washington International Insurance Company ("Washington International").

The Government seeks to recover in excess of $8 million on eight single transaction bonds ("STBs") identifying Great American as surety and one continuous entry bond ("CEB") identifying Washington International as surety.  The bonds at issue secure the payment of antidumping duties on entries imported by New Phoenix International Trade Corp. ("New Phoenix"), the principal on the bonds.  The bonds cover seven entries of crawfish tail meat imported into the United States from the People's Republic of China ("PRC") during 2000 and 2001.

The Plaintiff's motion is granted in part and denied in part.  The Defendant Great American's motion is granted in part and denied in part.  The Defendant Washington International's motion is denied.

## BACKGROUND

The pertinent facts are not in dispute.

On August 1, 1997, the U.S. Department of Commerce ("Department" or "Commerce") issued an antidumping duty order covering crawfish tail meat from the PRC (the "subject

---

[1] Great American Insurance Company of New York, a subsidiary of Great American Insurance Company, was formerly known as American National Fire Insurance Company.  "Great American" refers to the company both before and after the name change.

merchandise").[2]  Between October 5, 2000 and May 17, 2001, New Phoenix (now defunct)

imported seven entries of the subject merchandise from two PRC exporters.  Five of the entries

(the "Suqian Entries") were exports by Suqian Foreign Trade Corp. ("Suqian").  The other two

entries (the "Coastal Entries") were exports by Coastal (Jiang Su) Foods Co., Ltd. ("Coastal").

New Phoenix posted bonds in lieu of a cash deposit for the Coastal and Suqian Entries.[3]

Customs accepted eight STBs identifying New Phoenix as the principal and Great American as

the surety.  Customs also accepted one CEB, valued at $50,000, identifying New Phoenix as the

principal and Washington International as the surety.  For the five Suqian Entries, James C.

Davis signed and executed the STBs provided to Customs as Great American's agent (the

"Suqian Bonds").  For the two Coastal Entries, Great American filed three STBs (the "Coastal

Bonds").  Agent Davis signed and executed one of the Coastal Bonds.  Another Great American

agent, William Groves, signed and executed the remaining two STBs (the "Groves Bonds") for

the other Coastal Entry.  At the time Davis and Groves executed the STBs with New Phoenix,

they were agents of Great American with power-of-attorney authority to execute surety bonds on

Great American's behalf.  See 19 C.F.R. § 113.37(g)(4) (a corporate surety power of attorney

continues in force and effect until revoked).

---

[2] After Commerce made its preliminary determination that crawfish tail meat from the PRC was being sold below fair value and directed Customs to suspend the liquidation of entries of such merchandise, Commerce issued its antidumping order directing Customs to continue that suspension until further notice. Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg 41,347, 41,358 (Dep't Commerce Aug. 1, 1997), amended at 62 Fed. Reg. 48,218 (Dep't Commerce Sep. 15, 1997) (final determination) ("Final Determination").

[3] Both Suqian and Coastal were subject to new shipper reviews when the Suqian and Coastal Entries entered the United States.  See Freshwater Crawfish Tail Meat from the People's Republic of China, 64 Fed. Reg. 61,833, 61,834 (Dep't Commerce Nov. 15, 1999) (initiation of new shipper review); Freshwater Crawfish Tail Meat from the People's Republic of China, 65 Fed. Reg. 66,525 (Dep't Commerce Nov. 6, 2000) (initiation of new shipper review). Commerce instructed Customs to allow, at the option of the importer, the posting of a bond or a security in lieu of a cash deposit for each entry of merchandise exported by a company subject to a new shipper review. Id.; see 19 U.S.C. § 1675(a)(2)(B)(iii); 19 C.F.R. § 351.214(e).

On October 26, 2001, in response to timely requests from interested parties,[4] Commerce

published a notice in the Federal Register that it was initiating an administrative review of the

antidumping order covering the subject merchandise from the PRC for the period of review

("POR") between September 1, 2000 and August 31, 2001.  Initiation of Antidumping and

Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 66 Fed. Reg.

54,195, 54,196 (Dep't Commerce Oct. 26, 2001) ("Notice of Initiation").  Pending the outcome

of the administrative review, Commerce suspended the liquidation of merchandise subject to the

review, including the entries at issue.  See id. (listing Coastal and Suqian as named exporters

subject to the review).  Customs provided notice of the suspension to New Phoenix and

Washington International pursuant to section 504 of the Tariff Act of 1930, 19 U.S.C. § 1504(c)

(2006).[5]  Customs did not notify Great American of the suspension.

On August 6, 2002, Commerce rescinded its administrative review of Coastal, as well as

certain other PRC exporters of the subject merchandise, via publication in the Federal Register.

Notice of Rescission, 67 Fed. Reg. at 50,861.  On January 7, 2003, Commerce issued liquidation

instructions to Customs for the Coastal Entries at the "as-entered" rate.  On April 21, 2003,

Commerce published the final results of the administrative review.  See Freshwater Crawfish

Tail Meat from the People's Republic of China, 68 Fed. Reg. 19,504 (Dep't Commerce Apr. 21,

2003) (final results of administrative review) ("Final Results").  Commerce then issued

---

[4] "On September 28, 2001, the Department received a timely request from the Crawfish Processors Alliance, petitioner in this case, and the Louisiana Department of Agriculture & Forestry and Bob Odom, Commissioner, for an administrative review covering the period from September 1, 2000, through August 31, 2001, in accordance with 19 CFR 351.213(b)(1)."  Freshwater Crawfish Tail Meat From the People's Republic of China, 67 Fed. Reg. 50,860 (Dep't Commerce Aug. 6, 2002) (notice of rescission in part) ("Notice of Rescission").
[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2006 edition.

liquidation instructions to Customs for the entries suspended pending the completion of the administrative review.

After liquidation of the subject entries, Customs was unable to obtain payment of the assessed antidumping duties from New Phoenix.  Customs sought payment from both sureties. To date, Great American and Washington International have not made any payments.  The Government commenced this action on May 8, 2009.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1582(2) (2006).

Both parties have filed for summary judgment.  Summary judgment is appropriate "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  USCIT R. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2,548, 2,552 (1986).  A party moving for summary judgment bears the burden of demonstrating that there are no genuine issues of material fact in dispute.  Herman v. William Brooks Shoe Co., 7 Fed. Appx. 941, 943 (Fed. Cir. 2001).

## DISCUSSION

Great American's motion for summary judgment raises a number of affirmative defenses to the Government's action to recover on the bonds at issue.

First, Great American claims that the five Suqian Bonds and two Groves Bonds are void under principles of agency law because the value of the STBs exceeded the power-of-attorney authority of the agents who executed the STBs on Great American's behalf.

Second, Great American argues that the Government's claims on all of the STBs are time-barred. According to Great American, Customs' failure to provide Great American with section 1504(c)[6] notice of the suspension of liquidation of the entries at issue invalidated the suspension as a matter of law. Consequently, Great American asserts the entries liquidated by operation of law one year from the date of entry, pursuant to 19 U.S.C. § 1504(a)(1), more than six years before the Government filed its complaint. See 28 U.S.C. § 2415(a). Although Washington International received notice of the suspension, it joins Great American's argument that the Government's claims are untimely because Customs' failure to provide statutory notice to Great American, the STB surety, invalidated the suspension. Great American, but not Washington International, argues in the alternative that even if the lack of notice did not invalidate the suspension as a matter of law, the suspension was invalidated in this case because Customs' procedural error in failing to provide notice was not harmless and prejudiced Great American.

Third, Great American asserts that Customs' failure to provide notice of the suspension of liquidation of the subject entries discharged Great American's obligations as surety under the law of suretyship.

Finally, according to Great American, even if the court finds the suspension of liquidation valid despite Great American's lack of notice, the Government's claims under the three Coastal Bonds are still untimely because the Coastal Entries were deemed liquidated six months after Commerce published the Notice of Rescission in the Federal Register, pursuant to

---

[6] Section 1504(c) refers to 19 U.S.C. § 1504(c).

19 U.S.C. § 1504(d), more than six years before the Government filed its complaint.  See 28

U.S.C. § 2415(a).

      The court examines these defenses separately.

**1.      The Validity of the Suqian and Groves Bonds Under Agency Law Principles**

      Great American claims that the five Suqian Bonds executed by agent Davis are invalid

because the value of the bonds exceeded his power-of-attorney authority to execute surety bonds

on Great American's behalf.  Great American further claims that Customs improperly accepted

the two Groves Bonds for a single entry.  Moreover, the combined value of the Groves Bonds

exceeded Groves's power-of-attorney authority, as stated on the face of the bonds.  The court

disagrees and finds that the Suqian and Groves Bonds are not void.

      **a.  The Suqian Bonds are not void under agency law principles**

      Under Customs' regulations, a surety must file a corporate surety power-of-attorney on a

Customs Form 5297 ("Form 5297") for agents it appoints to execute customs bonds on its

behalf.  See 19 C.F.R. § 113.37(g).  In 1996, Great American filed a Form 5297 for Davis.[7]

Between September 2000 and February 2001, Davis executed a separate STB for each of the five

Suqian Entries with importer New Phoenix, the principal on the bonds.  Each of the Suqian

Bonds had a face value of approximately $1.2 million and identified Great American as the

surety.

---

[7] In 1996, Great American executed an agency agreement authorizing Chesapeake Brokers International ("CBI") to underwrite and execute customs bonds on Great American's behalf.  Great American later filed a Form 5297 for CBI employee, James Davis.  In 1999, after the CIMA companies ("CIMA")  acquired CBI, Great American entered into a similar agency relationship with CIMA.  The Form 5297 for Davis remained in force following CIMA's acquisition of CBI and was in effect when Davis executed the Suqian Bonds.

Great American challenges the validity of the Suqian Bonds.  According to Great American, the Suqian Bonds are void and unenforceable under principles of agency law because Davis's authority to issue bonds on its behalf was limited to $1 million on any single bond obligation.

The court finds that the Suqian Bonds are valid contracts between Great American and New Phoenix.  It is well established in agency law that a principal is bound by a contract entered into by its agent, purportedly on the principal's behalf, if the agent was authorized, actually or apparently, to bind the principal.  See Restatement (Third) of Agency § 6.01, cmt. b (2006) ("An agent has power to make contracts on behalf of the agent's principal when the agent acts with actual or apparent authority."); see also United States v. Pan Pacific Textile Group, Inc., 29 CIT 1013, 1022, 395 F. Supp. 2d 1244, 1252 (2005).  "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03; see also Deere & Co., v. Int'l Trade Comm'n, 605 F.3d 1350, 1357 (Fed. Cir. 2010) (apparent authority can be established by the fact that "the principal knowingly permits the agent to act as if the agent is authorized, or by silently acting in a manner which creates a reasonable appearance of an agent's authority.") (citations omitted).

New Phoenix entered into the Suqian Bonds with Davis, an agent holding himself out as having the apparent authority to bind Great American.  The record does not demonstrate that it was unreasonable for New Phoenix to believe that Davis was authorized to execute bonds valued in excess of $1 million.  See Restatement (Third) of Agency § 2.03.  Even if Great American's

underwriting authority letter granting Davis authorization to issue bonds limited Davis's

authority up to a certain amount, there is no indication that New Phoenix received copies of

these letters or otherwise knew about the limitations on Davis's authority.  Limitations specified

in the underwriting authority letter for Davis or in Great American's agency agreement

authorizing the agency to underwrite and execute customs bonds on Great American's behalf[8]

does not relieve Great American of its liability given that Davis had apparent authority to enter

into the Suqian Bonds with New Phoenix.  See Restatement (Third) of Agency § 2.03, cmt. c

("In the principal's relations with third parties, restrictions that the principal has placed on the

agent's authority are inoperative if apparent authority is present just as, by analogy, an offeror's

unexpressed meaning that is unknown to the offeree is inoperative as to the offeror's contractual

relations with the offeree.").

        Nevertheless, Great American maintains that it is relieved of liability on the Suqian

Bonds because the Form 5297 filed with Customs in 1996 stated that Davis's authority on any

single bond obligation was limited to $1 million.  Thus, Great American's argument that the

Suqian Bonds are invalid under principles of agency law does not focus on the validity of the

contractual relationship between the surety and the principal, i.e. the bond agreements with New

Phoenix.  Instead, Great American focuses on the alleged error of Customs, the obligee or third-

---

[8] Great American asserts that its agreement with CBI and CIMA limited the authority of CBI and CIMA agents: an agent could not execute an STB for more than $500,000 without advance approval from Great American.  With advance approval, the agents could execute bonds up to $1 million.

party beneficiary under the Suqian Bonds,[9] as a defense to the Government's ability to recover on the STBs.

The Form 5297 is the only document Great American filed with Customs advising Customs of Davis's authority to issue bonds on Great American's behalf.  Neither Great American nor Customs can provide an original or a copy of the Form 5297 for agent Davis submitted to Customs.[10]  Great American alleges that Customs' electronic record, which does not indicate any such limit on Davis's authority, is the result of a data entry mistake.[11]  The Government argues that the information in Customs' computer records is presumed to be accurate and that Great American does not overcome this presumption because it cannot produce any contemporaneously created documents providing information different from that in Customs' electronic records.  See Int'l Cargo and Sur. Ins. Co. v. United States, 15 CIT 541, 544, 779 F. Supp. 174, 177 (1991) (Customs officials are "entitled to a presumption that their duties are performed in the manner required by law"); Riggs Nat'l Corp. & Subsidiaries v.

---

[9] A "surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)."  Nat'l Am. Ins. Co. v. United States, 498 F.3d 1301, 1304 (Fed. Cir. 2007) (quoting Ins. Co. of the West v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001)).  The Federal Circuit has held there is no privity of contract between the government and a surety.  See Ransom v. United States, 900 F.2d 242, 244-45 (Fed. Cir.1990); Admiralty Constr., Inc. v. Dalton, 156 F.3d 1217, 1220 (Fed. Cir. 1998).

[10] The Form 5297 was a three-part form and only the top form was sent to Customs.  Great American did not produce a copy of the Form 5297 submitted to Customs or an "original" second or third copy of the three-part form.  The Government notes that the documentation produced by Great American to support its position is an incomplete copy of a Form 5297 for Davis that lacks the corporate seal and one of the two required signatures.

[11] According to Great American, Customs' electronic record is not the best evidence.  Great American points out that Customs incorrectly inputted information into the electronic record from a Form 5297 for another agent, including failing to state the limit on that agent's authority.  That Form 5297 was submitted to Customs along with the Form 5297 for Davis.  Thus, Great American argues the electronic error reflects a mistake on the part of the person inputting the information into Customs' record, and indicates that the same mistake was made when entering the authorization limit for Davis.  Moreover, Great American points out that the Form 5297 for Davis contained two typographical errors and switched Davis's first and last name.  Great American further argues that the statutory presumption of correctness does not apply in a civil action like this case where no previous Customs' ruling is under review.

C.I.R., 295 F.3d 16, 20 (D.C. Cir. 2002) ("Common law has long recognized a presumption of

regularity for actions and records of public officials.") (citations omitted). Thus, the parties'

dispute over the validity of the Suqian Bonds is concentrated on an evidentiary debate over what

constitutes the best evidence of the information contained in the Form 5297 Great American

filed with Customs in 1996.

However, even assuming that Great American is factually correct that the Form 5297 it

submitted to Customs stated that Davis was authorized to issue bonds up to $1 million, the

Suqian Bonds are valid contracts entered into by importer New Phoenix and agent Davis on

behalf of Great American as surety. The Suqian Bonds are not invalid and unenforceable if

Customs erred in inputting the data submitted on Davis's Form 5297 into its electronic record.

In order for Customs to accept a bond, the amount must be less than or equal to the

authorization limits on record. Customs' acceptance of bonds in excess of $1 million indicated

to Great American that Customs' records reflected that these bonds were authorized. Even if an

agent did not advise Great American of a particular bond in excess of $1 million when the bond

was executed, Great American, as surety, is responsible for supervising its bonding program and

ensuring its authorized agents follow internal procedures. Great American is not relieved of its

liability if its authorized agent did not advise it of these particular bonds.[12] Furthermore, Great

American was on notice that its agents, including Davis, were issuing bonds in excess of $1

million for years prior to the issuance of the Suqian Bonds. Great American received reports

listing bonds issued by CBI or CIMA with face values above $1 million, including bonds

---

[12] According to Great American, it first leaned of the existence of the bonds at issue in September 2003 from counsel
for Washington International. Great American states that this is a not a fact upon which its motion is based.

executed by Davis.  Nevertheless, Great American did not notify Customs that these bonds

exceeded Davis's authority nor did Great American revoke Davis's authority to issue bonds.

        Thus, Great American's argument that Customs did not have a reasonable basis for

concluding that Davis had authority to execute the Suqian Bonds is unpersuasive.  See Nat'l

Labor Relations Bd. v. Dist. Council of Iron Workers, 124 F.3d 1094 (9th Cir. 1996) ("Apparent

authority arises from the principal's manifestations to a third party that supplies a reasonable

basis for that party to believe that the principal has authorized the alleged agent to do the act in

question.").  After issuing the Form 5297 in 1996, Great American's conduct demonstrated that

Davis had authority to enter into these bonds.  Great American never sought to verify, correct, or

challenge the information in Customs' records relating to the scope of Davis's authority prior to

the commencement of this action.  Under these circumstances, Great American fails to

demonstrate that the Suqian Bonds are invalidated under agency law principles because the

electronic records of Customs, the obligee, did not accurately reflect the authorization limit

specified in Great American's agreement with Davis.

**b.  The Groves Bonds are not void under agency law principles**

        The parties also dispute the validity of the two Groves Bonds executed by Groves to

secure a single Coastal entry.[13]  The bonds were valued at $500,000 and $450,200, together

totaling $950,200.  The legend on the face of both bonds, below Groves' signature, states,

"Authority limited to $500,000."  Great American had previously filed a Form 5297 with

Customs stating that Groves was authorized to execute customs bonds up to $1 million.

_____

[13] When the Groves Bonds were issued, Groves was employed by CIMA, Great American's managing general agent
for customs bonds.

Great American formulates an anemic argument that the Groves Bonds are unauthorized and invalid.  According to Great American, because of the limiting language on the face of the bonds, Groves lacked the authority to bind Great American for more than $500,000.  Therefore, Great American maintains that Commerce improperly accepted the Groves Bonds for a single entry because the combined value of the bonds exceeded the agent's authority as stated on the face of the bonds.  However, as the Government points out, Groves's Form 5297 filed with Customs controls any limit on his authority.  Great American acknowledges that a surety can only amend the dollar limitation on an agent's authority by filing a 5297.  See 19 C.F.R. § 113.37(g)(4), (5) (specifying the steps taken to modify or revoke a power of attorney).  The Form 5297 filed on behalf of Groves authorized Groves to execute bonds of up to $1 million.  The combined value of the Groves Bonds is within Groves's $1 million authorization limit in his Form 5927 filed with Customs.  Furthermore, neither Groves Bond exceeded the $500,000 limit stated on the face of the bonds.  Therefore, Great American's claim that the Groves Bonds were unauthorized is meritless.

Moreover, Great American's assertion that Customs improperly accepted two STBs for a single entry, thus negating the validity of the STBs, lacks legal and evidentiary support.  There is no statute or regulation relieving a surety of any responsibility for payment if two bonds cover the same entry.  Great American does not identify a statute or regulation prohibiting Customs from accepting two bonds on a single entry.  Great American also fails to identify any contract or written policy in its agency agreement or in the letter formulating Groves's authority expressly prohibiting two bonds on a single entry.  Therefore, the Groves Bonds are not void under principles of agency law.

**2.        The Effect of Great American's Lack of Notice on the Validity of the Suspension**

One of the significant issues in this case is the effect, if any, of Customs' failure to

provide a surety with section 1504(c) notice of a suspension of liquidation.  Specifically, the

issue is whether Customs' failure to provide Great American with notice of the suspension of

liquidation of the subject entries invalidated the suspension.  For the reasons set forth below, the

court holds that it does not.

Liquidation occurs either as a result of action by Customs (active liquidation) or by

operation of law as a result of the passage of a period of time specified by statute (deemed

liquidation).  An entry of merchandise is deemed liquidated by operation of law one year after

the date of entry unless liquidation is extended or suspended.  19 U.S.C. § 1504(a).  If the

liquidation of any entry is suspended, notice is to be provided to the importer and to any

authorized agent and surety of such importer.  19 U.S.C. § 1504(c).

Customs' claim for antidumping duties from Great American is barred "unless the

complaint is filed within six years after the right of action accrues."  28 U.S.C. § 2415.  The

Government's right of action accrues from the date of liquidation.  The Government's right to

collect additional duties attaches when the entry liquidates.  19 C.F.R. § 113.62(a).  The

obligation to pay the additional duties attached upon liquidation, and because liability is joint

and several, the surety's liability accrued at the same time the importer's (principal's) liability

accrued.  See id. (the obligors, (principal and surety, jointly and severally) agree to pay, as

demanded by Customs, all additional duties, taxes, and charges subsequently found due, legally

fixed, and imposed on any entry secured by the bond.).  The parties agree that the six year statute

of limitations period runs from the date of liquidation  However, the parties disagree as to when the liquidation of the entries occurred.

Great American argues that liquidation was not suspended in accordance with section 1504(c) because Customs did not provide Great American, the surety identified on the STBs, with notice of the suspension.  Accordingly, Great American claims that the suspension was invalid and that the entries liquidated by operation of law one year after the date of entry pursuant to 19 U.S.C. § 1504(a).  Great American argues that the Government's claims are time-barred because the Government did not commence this action within six years of deemed liquidation.  See 28 U.S.C. § 2415.

The Government asserts that the lack of notice to Great American did not invalidate the suspension of liquidation on multiple grounds.  According to the Government, the notice provisions of section 1504(c) are merely directory or permissive, not mandatory, because they do not state a consequence for the Government's failure to comply with the notice requirement.  See Canadian Fur Trappers Corp. v. United States, 12 CIT 612, 615, 691 F. Supp. 364, 367 (1988).  The Government further claims that even if the suspension notice provisions are mandatory, because the statue refers to "any authorized agent and surety," Customs complied with the statute by notifying the CEB surety, Washington International.  See 19 U.S.C. § 1504(c) (emphasis added).  Finally, the Government argues that any error in failing to provide notice to Great American was harmless.  In other words, the Government maintains that its claims are not time-barred because the suspension of liquidation occurred as a matter of law, regardless of whether notice was provided to Great American.  Accordingly, the Government maintains that the subject entries did not liquidate until the completion of its administrative review covering

those entries, less than six years prior to the Government's commencement of this action on May

8, 2009.

### a. The suspension of liquidation was not invalidated by the failure of Customs to provide Great American with notice of the suspension

As this Court has previously determined, as a matter of law, Customs' failure to provide a

surety with notice of a valid suspension of liquidation does not invalidate an otherwise valid

suspension.  See United States v. Am. Home Assurance Co., Slip Op. 11-57, 2011 WL 1882635,

*4 (CIT May 17, 2011) ("AHA"); Am. Nat'l Fire Ins. Co. v. United States, 30 CIT 931, 941, 441

F. Supp. 2d 1275, 1298 (2006) ("ANF").

Under the statutory scheme, "the administrative review determination conducted by

Commerce 'shall be the basis for the assessment of . . . antidumping duties on entries of

merchandise covered by [Commerce's] determination and for deposits.'"  Koyo Corp v. United

States, 497 F.3d 1231, 1241 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1675(a)(2)(C)); see also 19

C.F.R. § 351.212(a) ("Generally, the amount of duties to be assessed is determined in a review of

the order covering a discrete period of time.").  "[T]he actual duty is not formally determined

until after entry, and not paid until the [entries] are liquidated by [Customs]."  Parkdale Int'l v.

United States, 475 F.3d 1375, 1376-77 (Fed. Cir. 2007); see also 19 C.F.R. § 351.212(a)

("[F]inal liability for antidumping . . . duties is determined after merchandise is imported.").

Because final liquidation cannot occur until the completion of the review determining the final

amount of duties, suspension of liquidation is impliedly required by statute, pursuant to 19

U.S.C. § 1675(a)(2), during the review.  See SSAB N. American Div. v. United States, 31 CIT

__, __, 571 F. Supp. 2d 1347, 1351 (2008) (explaining "the statutorily implied suspension of

liquidation contained in 19 U.S.C. § 1675(a)(2) that applies to entries of subject merchandise

covered by an administrative review of an antidumping order"); see also Koyo Corp., 497 F.3d at

1241-42; Ambassador Div. of Florsheim Shoe v. United States, 748 F.2d 1560, 1561 (Fed. Cir.

1984) (suspension of liquidation impliedly required by statute during administrative review of

countervailing duty order to effectuate the system of duty assessment); Am. Permac, Inc. v.

United States, 10 CIT 535, 539, 642 F. Supp. 1187, 1191 (1986) ("Because 19 U.S.C. §

1675(a)(2) expressly calls for the retrospective application of antidumping review determinations

. . . suspension of liquidation during the pendency of a periodic antidumping review is

unquestionably 'required by statute.[']").

        Here, liquidation of the entries at issue was suspended, pursuant to section 1675(a)(2),

when Commerce received timely requests, in accordance with 19 C.F.R. § 351.213(b), for an

administrative review of the antidumping duty covering the subject entries.  See AHA, 2011 WL

1882635 at *3-4 (similarly concluding that liquidation of the subject entries was suspended by

operation of law when Commerce received the requests for the administrative review for the

PORs covering those entries); Canadian Wheat Bd. v. United States, 33 CIT __, __, 637 F. Supp.

2d 1329, 1334 n. 6 (2009), aff'd No. 2010-1083 Slip Op. (Fed. Cir. 2011) (a request for an

administrative review suspends liquidation pending the outcome of the review); Clearon Corp v.

United States, 34 CIT __, __,  717 F.Supp.2d 1366, 1369 n.1 (2010) ("If a timely request for

review is made, Commerce publishes notice of initiation of the review in the Federal Register

and commences the review, during which time liquidation is suspended.").

        As the court explained in AHA, under the statutory framework, suspension is "automatic,

upon Commerce's  receipt of the requests."  AHA, 2011 WL 1882635 at *3 (citing Tembec, Inc.

v. United States, 30 CIT 1519, 1525-26, 461 F. Supp. 2d 1355, 1361 (2006), and judgment

vacated on other grounds, 31 CIT 241, 475 F. Supp. 2d 1393 (2007); SSAB N. Am. Div, 31 CIT

at __, 571 F. Supp. 2d at 1351; Alden Leeds Inc. v. United States, 34 CIT __, __, 721 F. Supp.

2d 1322, 1325-26 (2010)).  "Liquidation is suspended during the review so the liquidation will

take place in accordance with the review's result."  Clearon Corp., 34 CIT at __, 717 F. Supp. 2d

at 1370.

     If the liquidation of an entry is suspended, Customs is to provide notice of the suspension

to the importer, and to any authorized agent and surety of such importer.  19 U.S.C. § 1504(c);

see 19 C.F.R § 159.12(c).  Nevertheless, "failure to provide notice of a suspension does not

necessarily vitiate a suspension."  ANF, 30 CIT at 941, 441 F. Supp. 2d at1286.  The plain

language of 19 U.S.C. § 1504 provides that notice of a suspension of liquidation is provided to a

surety *after* the suspension occurs by operation of law.  As explained in AHA:

> suspension of liquidation is a condition precedent to the notice requirement, not
> vice versa.  Accordingly a surety is not entitled to notice until after liquidation has
> been suspended.  In other words, notice is not a prerequisite to suspension but is
> provided as a consequence of a suspension having occurred.

2011 WL 1882635 at *4.  Regardless of whether the notice provisions of section 1504(c) are

permissive or mandatory, the failure to give notice does not affect the validity of the suspension.

"Because it is clear that the giving of notice is not a condition precedent to a suspension of

liquidation, the failure to give notice does not prevent an otherwise valid suspension."  Id.

     This comports with the statutory framework under which Commerce determines the rate

and amount of antidumping duties under 19 U.S.C. § 1514(a)(2), whereas Customs merely

provides a ministerial role in antidumping duty determinations.  See Mitsubishi Elec. Am., Inc.

v. United States, 44 F.3d 973, 977 (Fed. Cir. 1994).  "[S]uspension of liquidation enables

Commerce to calculate assessment rates for the subject entries, see 19 U.S.C. § 1675(a)(2),

which are then applied by Customs pursuant to liquidation instructions received from Commerce

after publication of the final results of an administrative review."  SSAB, 31 CIT at __, 571 F.

Supp. 2d at 1351.  "Customs merely follows Commerce's instructions in assessing and collecting

duties."  Mitsubishi, 44 F.3d at 977; see Koyo Corp., 497 F.3d at 1242 (explaining "Congress'

intent to delegate to Commerce the authority to establish special duty rates, leaving Customs

only the ministerial capacity to liquidate antidumping duties according to Commerce's directions

as determined through the administrative and judicial review process").

      Great American's claim that Customs' failure to notify Great American invalidated the

suspension as a matter of law is inconsistent with the statutory framework and is unsupported by

the plain language of 19 U.S.C. § 1504.  "Deemed liquidation results from operation of law and

Customs makes no decision and performs no act in order to bring about a deemed liquidation."

AHA, 2011 WL 1882635 at *5 (citing Alden Leeds, 34 CIT at __, 721 F. Supp. 2d at 1329.

Pursuant to 19 U.S.C. 1504(d), in order for deemed liquidation to occur, the suspension of

liquidation that was in place must have been removed.  See Fujitsu Gen. Am., Inc. v. United

States, 283 F.3d 1364, 1376 (Fed. Cir. 2002) ("Fujitsu"); Alden Leeds, 34 CIT at __, 721 F.

Supp. 2d at 1329 ("A suspension of liquidation acts to stop liquidation, including a deemed

liquidation, from occurring").  Commerce suspended the liquidation of the subject entries

following the request for a periodic review covering those entries.  Customs' subsequent action,

or in this case, non-action, cannot remove a valid suspension of liquidation by Commerce.

In sum, there is no deemed liquidation while a valid suspension is in place.  See AHA,

2011 WL 1882635 at *5 (rejecting the identical deemed liquidation argument).  The suspensions

at issue were valid despite Great American's lack of notice.  Accordingly, the entries at issue did

not liquidate by operation of law one year after entry.

### b.  Customs was required to notify Great American of the suspension of liquidation

Once the entries were validly suspended, Customs was statutorily required to provide

notice to Great American.  The plain language of the notice provisions clearly provides that

Customs is to provide notice of the suspension to "any authorized agent and surety of such

importer of record."  See 19 U.S.C. § 1504(c).  Moreover, by regulation, the port director

"promptly shall notify" the surety of the suspension.  See 19 C.F.R § 159.12(c).

Consistent with this Court's prior rulings, the notice provisions of section 1504(c) are

mandatory.  See ANF, 30 CIT at 941, 441 F. Supp. 2d at 1286; Hanover Ins. Co. v. United

States, 25 CIT 447, 455 (2001) ("Hanover"); see also AHA 2011 WL 1882635 at *6 (explaining

that if the surety was actually harmed as a result of Customs' failure to provide notice, the surety

would be entitled to appropriate relief.)  Accordingly, the court rejects the Government's

position that, notwithstanding this Court's determinations in Hanover and ANF, section 1504(c)

should be interpreted as merely permissive or directory because the statute does not state a

consequence for noncompliance.  The Government relies on Canadian Fur Trappers Corp.,

which states that "[i]t is settled that a statutory time period is not mandatory unless it both

expressly requires an agency or public official to act within a particular time period and specifies

a consequence for failure to comply with the provisions."  12 CIT 612, 615, 691 F. Supp. 364,

367 (1988) (internal citations omitted).  However, Canadian Fur Trappers Corp. does not state

that a statute that does not prescribe a time period, such as the notice provisions at issue here, must be construed as directory.

Moreover, the provision of notice to Washington International did not discharge Customs of its statutory obligation to provide notice to Great American.  The Government's claim that the requirement in section 1504(c) to provide notice to "any surety" means "one" as opposed to "every" surety of the importer of record is an incorrect interpretation of the plain language of the statute.  The statute requires notice to "any surety" because the requirement only applies if any such sureties are securing antidumping duties on a suspended entry.  Furthermore, the Government's interpretation is contrary to the intent of the notice provisions: to ensure that sureties are better able to control their liabilities and minimize the risk of loss.  See Hanover, 25 CIT at 455 (referring to the legislative record to explain the intent of the notice provisions).  It would frustrate this intent if Customs could select any one of multiple sureties to receive notice, while the others are deprived of the same opportunity.  Therefore, Customs erred in failing to provide notice of the suspension of liquidation to Great American.

### c.  Customs' error in failing to notify Great American is harmless

Although Customs' failure to provide notice to Great American did not invalidate the suspension as a matter of law, the court still must determine the consequence, if any, of Customs' procedural error.  "If, as is often the case, no law or regulation specifies the consequence of noncompliance with a regulation, the court must determine what remedy, if any, should be imposed."  AHA, 2011 WL 1882635 at *5  (quoting Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 85, 90, 414 F. Supp. 2d 1300, 1306 (2006)).

To determine the consequence of Customs' procedural error in failing to notify a surety of the suspension of liquidation, the court applies principles of "harmless error" or the "rule of prejudicial error."  AHA, 2011 WL 1882635 at *5 (holding that the court determines the consequence of failure to provide notice of suspension to a surety pursuant to section 1504(c) by applying the principles of harmless error and prejudicial error); see also Dixon Ticonderoga Co. v. United States, 468 F.3d 1353, 1356 (Fed. Cir. 2006); Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996) (applying the rule of prejudicial error to defective notice of extension of liquidation to plaintiff); Sea-Land Serv., Inc. v. United States, 14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990), aff'd and adopted, 923 F.2d 838 (Fed. Cir. 1991) ("Sea-Land") (applying harmless error standard to determine the consequence of Customs' failure to include information required by statute in a denial letter to plaintiff).

"Procedural errors by Customs are harmless unless the errors are 'prejudicial to the party seeking to have the action declared invalid.'"  ANF, 30 CIT at 942, 441 F. Supp. 2d at 1287, (quoting Sea-Land, 14 CIT at 257, 735 F. Supp. at 1063); see also Woodrum v. Donovan, 4 CIT 46, 52, 533 F. Supp. 202, 207 (1982) ("[C]ourts will not set aside agency action unless the procedural errors complained of were prejudicial to the party seeking to have the action declared invalid.").  Whether an error is harmless or prejudicial depends on the facts of a given case. Shinseki v. Sanders, 129 S. Ct. 1696, 1704-05 (2009) (whether an agency error is harmless is determined by "case-specific application of judgment, based upon examination of the record").  The party must plead the prejudice suffered from the procedural error.  See ANF, 30 CIT at 942, 441 F. Supp. 2d at 1287 (holding that Customs' procedural error in providing imperfect notice of suspension was harmless error because the surety does not state with any particularity the

prejudice suffered); Sea-Land, 14 CIT at 257, 735 F. Supp. at 207 (holding that Customs' failure

to include provisions required by law in denial letter to Plaintiff was still harmless error because

plaintiff did not plead any prejudice).

However, even if the lack of notice was prejudicial to Great American, the suspension of

liquidation of the entries is not invalidated as a consequence.  As previously discussed, the

suspension was automatic once Commerce received a request for the periodic review, which

occurs by operation of law and is not dependent upon the notice provisions of section 1504(c).

Similarly, the validity of a suspension itself is not dependent on a subsequent court

determination that Customs' failure to provide notice of the suspension to an interested party was

harmless error.  Therefore, the court disagrees with Great American's argument that a prejudicial

error determination would render the Government's claims time-barred by invalidating the

suspension and triggering deemed liquidation one year after entry.  Rather, if Customs' failure to

provide notice of the suspension prejudiced Great American, Great American would be entitled

to appropriate relief.  See AHA 2011 WL 1882635 at *5 ("[A]lthough Customs' failure to

provide notice does not invalidate the suspensions, if [the surety] was actually harmed as a result

of Customs' omissions, it would be entitled to appropriate relief.").  Therefore, the court applies

harmless error principles because a finding of prejudicial harm from the procedural error may

impair the Government's ability to recover on the bonds.

Prejudice, for purposes of harmless error analysis, "means injury to an interest that the

statute, regulation, or rule in question was designed to protect."  Intercargo, 83 F.3d at 396.  In

Hanover, the court discusses the interests the suspension provisions were designed to protect by

referring to the legislative history of the 1978 amendment to the liquidation statute, which

established a time limit on liquidation and the notice requirement.  "The primary justification for requiring notice to sureties under [section 1504(c)] was to minimize risk of loss."  Hanover, 26 CIT at 7.  The court explained that by providing notice, "[s]urety companies, which are jointly liable with importers for additional duties, would be better able to control their liabilities."  Id. at 8 (quoting S. Rep. No. 95-778 at 32 (1978)).

Great American alleges that Customs' failure to provide notice of the suspension was prejudicial because it took away liability reduction opportunities that were an essential component of Great American's risk under the bonds.  According to Great American, notification would have enabled Great American to make sure that, at least with respect to continuing activities, the risk of loss would be minimized.  Specifically, Great American argues that if it had received notice, it could have 1) sought collateral or other security from importer New Phoenix; 2) restricted its agents from issuing certain additional bonds; and 3) participated in Commerce' administrative review of the subject entries to seek the reduction or elimination of antidumping duties on those entries.  The court finds Great American's examples unpersuasive and finds there was no prejudicial harm from the procedural error.

First, Great American has not established any basis on which it could have demanded additional collateral from New Phoenix after the STBs had been issued.  Great American, as surety, was already obligated under the STBs.  Great American does not explain how New Phoenix could become obligated to provide more collateral simply because Great American received notice that the liquidation of the entries covered by the STBs was suspended.  Thus, a demand for additional collateral would, in effect, amount to a unilateral attempt to modify the contract.  Great American would be making a demand on the principal without establishing that

the principal would have received anything in exchange.  The record evidence does not

demonstrate prejudicial harm from the alleged lost opportunity to intervene with the importer to

foreclose further exposure on these STBs.

The court acknowledges that the situation could be quite different for CEBs because, on a

CEB, the surety can terminate the bond as to future entries.  In <u>Hanover</u>, the court mentions the

legislative history of the notice provisions of section 1504: "[T]he House committee explained,

'Thus, the sureties can take appropriate measures upon receiving this notice to make sure that at

least as to continuing activities, the risk of loss will be minimized.'"  <u>Hanover</u>, 26 CIT at 8,

(quoting H. Rep. No. 95-621 at 25 (1977)).  A CEB covers entries over a period of time.  For a

CEB surety, notice of a suspension, in effect, puts the surety on notice of activity by its principal

that involves increased risk.  Therefore, a CEB surety has the ability to terminate the bond and

prevent future liability.  <u>See</u> 19 C.F.R. § 113.27.  In contrast, the STBs at issue each covered a

discrete activity pursuant to a single entry.  <u>See</u> 19 C.F.R. § 113.61.  Termination is not a legal

option for an STB surety.  19 C.F.R. § 113.27(c).

Great American's argument that it was prejudiced because it could have imposed stricter

limits on its agents is equally unpersuasive.  Great American alleges that if it had received

notice, it could have instructed its agents not to issue any additional bonds securing entries of

merchandise subject to antidumping duty orders or bonds for amounts in excess of the

authorization limit as filed with Customs.  However, any limitations on future bond issuance by

an agent do not affect the surety's liability on the STBs already executed on the surety's behalf.

Great American's obligation to supervise its agents, and ensure that its agents issue bonds within

their authorization limits, is not dependent upon receiving suspension notices.  A suspension

notice provides an importer or surety with an individualized form of notice that liquidation of a

particular entry has been suspended.  Informing a surety of the existence or value of a particular

bond is not the purpose of section 1504(c) notice.  In fact, a notice of a suspension does not

identify a particular bond or the value of the merchandise in the entry.  In addition, each of the

STBs at issue bears a rating code indicating that the bond covers an import entry subject to an

antidumping duty order.  Even if a suspension notice prompted Great American to limit or

revoke an agent's authority, any future limitations could not limit Great American's exposure to

liability on the STBs in question.

Finally, Great American maintains that it was prejudiced by losing the opportunity to

stand in the shoes of the importer and participate in Commerce's administrative review of the

subject entries.  This lost opportunity, in itself, is insufficient to demonstrate prejudice.

This Court has found that sureties are "interested parties" within the meaning of 19

U.S.C. § 1677(9), and acquire their bond principals' "administrative and judicial rights . . . to

appear and participate in antidumping . . . duty proceedings having a potential impact on them.".

See Lincoln Gen. Ins. Co. v. United States, 28 CIT 931, 341 F. Supp. 2d 1265 (2004)

("Lincoln").  In Lincoln, the surety sought the opportunity to bring claims relating to fraudulent

schemes which were used to avoid payment of antidumping duties.  Id. at 1266-67.  The court

explained that "[s]ince the importers chose not to assert their claims to Commerce, Lincoln, as

surety may therefore do so on their behalf."  Id. at 1271.

Unlike the surety in Lincoln, Great American does not indicate any potential claims that

it could have brought on behalf of the importer to reduce or eliminate its risk of loss under the

bonds.  Great American does not explain how it could have conceivably reduced or eliminated

the duties assessed on the subject entries had it participated in the administrative review.

Even if Great American stood in the shoes of New Phoenix, an importer does not have a

claim for a separate duty rate.  The Federal Circuit has affirmed Commerce's methodology

whereby an importer is not entitled to an assessment rate different from the rate assigned to the

exporter, even if the importer was independent from the exporter and cooperative with

Commerce.  See KYD, Inc. v. United States, 607 F.3d 760, 768 (Fed. Cir. 2010) (KYD I).  In

upholding Commerce's duty rate assessment, the Federal Circuit acknowledged that, "[t]he

prospect that domestic importers will have to pay enhanced antidumping margins because of the

uncooperativeness of the exporters from whom they purchase goods may, in some cases, result

in the imposition of costs on an individual importer that the importer is unable to avoid."  Id.

Although Commerce is not required to calculate a separate dumping margin for

individual importers, the particular duty rate must be supported by substantial evidence and

otherwise in accordance with law.  See KYD Inc. v. United States, Slip Op. 11-49, 2011 WL

1741913 *8 (CIT Apr. 28, 2011) ("KYD II").  As the court explained in KYD II, the Federal

Circuit ruling in KYD I, rejecting the importer's request for a special non-adverse assessment

rate, does not foreclose an importer from presenting current information relevant to the

antidumping duty determination.  See id.  The Federal Circuit invited importers "to produce

current information showing the dumping margin to be less."  Id. at *14 (quoting KYD 1, 607

F.3d at 766-67).  In KYD II, the court determined that substantial evidence on the record,

including the information submitted by the importer relating to current information for the POR,

did not support the particular adverse rate Commerce selected.  Therefore, the court remanded to

Commerce because the duty rate for the POR did not satisfy the substantial evidence standard.

Id.  In contrast, Great American does not allege that Commerce's assessment rate for the subject

Entries is unsupported by substantial evidence, nor does it present any information relating to the

POR.

Furthermore, Great American does not maintain that any relevant facts were excluded

from the administrative record.  In Hide-Away Creations, Ltd., v. United States,  the court found

that the International Trade Administration's (ITA) failure to publish in the Federal Register the

specific date for commencing an administrative review, as required by statute, prejudiced the

plaintiff.  6 CIT 310, 318-19 577 F. Supp. 1021, 1027 (1983).  As the court explained, because of

the lack of notice, the ITA excluded untimely filed certificates relevant to determining eligibility

for a zero deposit duty rate.  Id. at 319, 577 F. Supp. at 1028.  The court remanded to for

consideration of the certificates.  Id.  The Hide-Away court analogized to Woodrum v. Donovan,

where the court found that the Secretary of Labor's failure to conduct an investigation and

failure to publish mandatory notice of the receipt of plaintiff's petition for certification

prejudiced the plaintiffs because the procedural errors had the effect of excluding from the

administrative record facts which were directly relevant to the Secretary's determination that

plaintiffs were not eligible for trade assistance.  Woodrum, 4 CIT at 53, 544 F. Supp. at 207

(1982).  Here, even if relevant evidence was excluded from the administrative review, which

Great American does not allege, there is no indication that the procedural error, i.e., the lack of

notice of the suspension, was in any way related to the exclusion of that evidence from the

administrative record.

Customs' procedural error, in itself, does not amount to a denial of due process establishing prejudicial harm.  See Former Emps. of Apache Corp. v. United States, 18 CIT 259, 268-69 850 F. Supp. 24, 31-32 (1994) ("Apache")  In Apache, the court held that the Secretary of Labor's failure to provide plaintiffs with actual notice of their right to a public hearing under 29 C.F.R. § 90.13(a) did not prejudice the plaintiffs and did not amount to a denial of due process.  Id.  As the court explained, the plaintiffs failed to indicate they possessed any pertinent information that they had not previously submitted to Labor.  Id. at 269, 850 F. Supp. at 32. Likewise, in Woodrum, although the court ruled that certain procedural errors[14] prejudiced the plaintiffs because "[t]hese procedural errors had the effect of excluding from the administrative record facts which are directly relevant to the Secretary's determination that plaintiffs are not eligible for trade adjustment benefits," the court also held that the Secretary's procedural error in failing to publish a notice of his final determination did not prejudice the plaintiff's rights. Woodrum, 4 CIT at 53, 544 F. Supp. at 207.  The court acknowledged that the notice provisions at issue were mandated by statute and give rise to important due process rights, i.e. the right to seek judicial review of that determination,[15] and that dispensing with the required notice "jeopardizes these rights."  Id. at 52, 544 F. Supp. at 206.  Nevertheless, the error in itself did not demonstrate prejudice to the plaintiffs and "[t]herefore, that error would not, by itself, compel the court to set aside the Secretary's determination."  Id. at 53, 544 F. Supp. at 207. Likewise, even if a surety's right to stand in the shoes of the importer and participate in an administrative

---

[14] The Woodrum court found that the Secretary's failure to conduct an investigation and his failure to publish notice of the receipt of a petition for trade adjustment assistance prejudiced the plaintiffs.  4 CIT at 53, 544 F. Supp. at 207.
[15] As the court explained, "petitioners have sixty days from the date of publication of a notice of a final determination within which to seek judicial review of that determination."  Id. at 52, 544, F. Supp. at 206.

review is an important right, and assuming the lack of notice of suspension jeopardizes these rights, the lost opportunity does not demonstrate injury to Great American in this action.

Great American's prejudice claim, in its briefs and during oral argument, assumes harm without requiring a showing thereof.  Great American's position suggests that any surety that failed to receive notice of a suspension, provided the surety did not have actual or constructive notice, could establish prejudicial harm by merely stating that it was deprived of the opportunity to participate in the administrative review, or by alleging other hypothetical liability-reduction opportunities, regardless of their feasibility.  However, whether an error is prejudicial or harmless depends on the facts of a given case.  Shinseki v. Sanders, 129 S. Ct. at 1704-05.  Great American's generalized claims of injury could apply to any surety that failed to receive notice, effectively eliminating the burden to provide a fact-specific showing of prejudice.  Without a fact-specific demonstration of injury to an interest that the notice provisions were designed to protect, the court cannot conclude that Great American has pled with particularity the prejudice suffered by the lack of notice.  See ANF, 30 CIT at 941-42.

Great American fails to show that Customs' failure to notify Great American of the suspension of liquidation amounts to prejudicial harm in this action.  Customs' procedural error is harmless.

**3.      Whether Great American is Discharged Under the Law of Suretyship**

Customs' failure to give Great American notice of the suspension of liquidation does not discharge Great American's obligations under the bonds.

This Court has relied upon suretyship law principles explained in the Restatement (Third) of Suretyship and Guaranty in determining the rights and obligations of parties under customs

bonds.  See, e.g., Washington Int'l Ins. Co. v. United States, 25 C.I.T. 207, 224, 138 F. Supp. 2d

1314, 1330 (2001) (relying on the Restatement (Third) of Suretyship and Guaranty to identify

"general principles of suretyship law" that this Court should apply).  Under the Restatement

(Third) of Suretyship and Guaranty § 37(1):

> If the obligee acts to increase the secondary obligor's risk of loss by increasing its
> potential cost of performance or decreasing its potential ability to cause the
> principal obligor to bear the cost of performance, the secondary obligor is
> discharged as described [in other subsections]…. An act that increases the
> secondary obligor's risk of loss by increasing its potential cost of performance or
> decreasing its potential ability to cause the principal obligor to bear the cost of
> performance is an impairment of suretyship status.

The critical question is whether an act of the obligee, in this case the Government,

"fundamentally alter[ed] the risks imposed on the secondary obligor," in this case, Great

American.  Id. at § 37(2).  In order for there to be an impairment of suretyship such that the

surety is discharged of its obligation, the increase in the surety's risk must be material.  See Old

Republic Ins. Co. v. United States, 10 CIT 589, 602 (CIT 1986); Washington Int'l, 25 CIT at

224, 138 F. Supp. 2d at 1331("The federal common law is clear that when a surety's contractual

obligation is materially altered without its knowledge or consent in a manner that increases its

risk, the surety is to be discharged to the extent that it is prejudiced or damaged.").

Here, as in Old Republic, the increase in Great American's risk due to the failure to

receive notice is not material.  See 10 CIT at 602-03, 645 F. Supp. at 955 (holding that Customs'

failure to provide notice of a liquidation extension did not materially increase the surety's risk

and did not discharge the surety from its obligations under the surety bonds).  Great American

essentially reiterates its prejudicial error claim, alleging that the lack of notice fundamentally

changed the risks of loss associated with the bonds by taking away liability-reduction

opportunities.[16]  Although Great American stresses the lost opportunity to participate in the

administrative review, it does not establish that this lost opportunity, in this case, materially

increased or "fundamentally altered" its risk of loss as secondary obligor under the bonds.  See

Restatement (Third) of Suretyship and Guaranty § 37(2).

      The lack of notice did not fundamentally alter the bargained-for exchange or materially

alter any of the contractual provisions in a way that increased Great American's contractual

liability.  See Washington Int'l, 25 C.I.T. 207, 224-25, 138 F. Supp. 2d at 1331 (finding that a

bankruptcy settlement agreement between the Government and the principal increased the

surety's exposure under the bonds but did not discharge the surety because the agreement did not

materially alter the bonds' contractual terms).  The STBs clearly establish Great American's

liability as surety.  "In the absence of a material alteration to its contractual agreement, the Court

possesses no legal grounds to discharge [a surety]  from its obligations under the surety bonds."

Id at 225, 138 F. Supp. 2d at 1332.  Great American is not discharged from its contractual

obligations as surety because of Customs' error in failing to provide section 1504(c) notice of

suspension.

**4.      Whether the Government's claims under the Coastal Bonds are time-barred**

      The court now turns to Great American's deemed liquidation claim relating to the two

Coastal Entries.  When Commerce initiated its administrative review, liquidation of entries

falling within the scope of the review, including the Coastal Entries, was suspended.  On August

6, 2002, Commerce rescinded its administrative review of Coastal's entries for the POR via

---

[16] As support, Great American repeats the prejudicial error argument that lack of notice deprived it of the opportunity to participate in the administrative proceeding to reduce or eliminate the antidumping duties on the entries and to intervene promptly with New Phoenix and/or Great American's agent to foreclose further exposure.

publication in the Federal Register.  See Notice of Rescission, 67 Fed. Reg. at 50,861.[17]  On May

9, 2003, Customs liquidated the Coastal Entries.

The parties disagree as to when the Coastal Entries liquidated.  Specifically, the parties

dispute whether the Coastal Entries were deemed liquidated as a matter of law on February 6,

2003, six months after Commerce published the Notice of Rescission rescinding its review of

those entries.

The statute that is the focus of this issue, 19 U.S.C. § 1504(d), governs the deemed

liquidation of entries whose liquidation previously was suspended.  Liquidation of an entry is

suspended by statute or court order.  19 U.S.C. § 1504(d).  When a suspension of liquidation

required by statute or court order is removed:

> The Customs service shall liquidate the entry . . . within 6 months after receiving
> notice of the removal from the Department of Commerce . . . Any entry . . . not
> liquidated by the Customs Service within 6 months after receiving such notice
> shall be treated as having been liquidated at the rate of duty, value, quantity, and
> amount of duty asserted at the time of entry by the importer of record.

19 U.S.C. § 1504(d).  Thus, in order for deemed liquidation to occur: 1) the suspension of

liquidation that was in place must have been removed; 2) Customs must have received notice of

the removal of suspension; and 3) Customs must not liquidate the entry at issue within six

months of receiving such notice.  Fujistu, 283 F.3d at 1376.  "Because section 1504 provides that

an entry will be deemed liquidated by operation of law if Customs does not liquidate the entry

within six months of receiving notice from Commerce that the suspension has been removed, it

---

[17] As Commerce explained, "pursuant to our regulations, the Department will rescind an administrative review, 'if a
party that requested the review withdraws the request within 90 days of publication of notice of initiation of the
requested review.'"  Notice of Rescission, 67 Fed. Reg. at 50,861 (quoting 19 C.F.R. § 351.213(d)(1)).  On
December 10, 2001, the petitioner withdrew its request for review of Coastal.

is critical to determine what constitutes the act that effects the removal of suspension and what

constitutes notice of the removal to Customs." Int'l Trading Co. v. United States, 281 F.3d

1268, 1271 (Fed. Cir. 2002) ("Int'l Trading").

     Great American maintains that Commerce's publication of the Notice of Rescission of

the review of the Coastal Entries in the Federal Register both removed the suspension of

liquidation on those entries, and served as section 1504(d) notice to Customs that the suspension

was removed.  Because Customs did not liquidate the Coastal Entries within six months of

publication, Great American asserts that the entries were deemed liquidated by operation of law

on February 6, 2003., i.e. six months after publication, at the rate of duty asserted on entry,

pursuant to section 1504(d).  Great American argues that the Government's claims as to the

Coastal Entries are time barred because the Coastal Entries were deemed liquidated as a matter

of law more than six years before the Government filed its complaint.  See 28 U.S.C. § 2415(a).

     The Government claims that the publication of the Notice of Rescission did not remove

suspension of liquidation of the Coastal Entries because the entries became tentatively subject to

the PRC-wide rate still under review.  In other words, the Government maintains that the Notice

of Rescission did not trigger Customs' six-month period, pursuant to section 1504(d), to

liquidate the Coastal Entries.  According to the Government, the suspension was not removed

until April 21, 2003, when Commerce published the final results of the administrative review, or,

on January 17, 2003, when Customs received liquidation instructions from Commerce for the

Coastal Entries.[18]

---

[18] As the Government points out, either way, Customs liquidated the Coastal Entries on May 9, 2003, within six months of the removal of suspension and less than six years before the Government brought this action.

Therefore, the court must determine: 1) whether the <u>Notice of Rescission</u> removed the

suspension of liquidation of the Coastal Entries for section 1504(d) purposes; and, if so, 2)

whether the <u>Notice of Rescission</u> constituted section 1504(d) notice to Customs that the

suspension of the Coastal Entries was removed.

### a. The publication of the Notice of Rescission removed the suspension of liquidation on the Coastal Entries

The statutory scheme governing suspension of liquidation supports Great American's

position that the <u>Notice of Rescission</u> removed the suspension of the Coastal Entries.

The rationale articulated in <u>Int'l Trading</u> and <u>Fujitsu</u> is instructive.  In <u>Int'l Trading</u>, the

liquidation of certain entries of merchandise subject to an antidumping duty order was suspended

by statute while Commerce undertook an administrative review of the order.  <u>Int'l Trading</u>, 281

F.3d at 1271.  The Federal Circuit found that the publication of the final results of the

administrative review removed the statutory suspension of liquidation on the subject entries,

despite Commerce's later instruction to Customs not to liquidate any entries covered by the

review until Customs received liquidation instructions from Commerce.  <u>Id</u>.   As support, the

Federal Circuit reasoned that:

> tying the removal of suspension to the issuance of an antidumping duty order or
> final results has the virtue of parallelism with the mechanisms by which
> suspension was initiated; thus suspension is begun by publication of an
> announcement of the antidumping investigation, and suspension is removed by
> the publication of the announcement of the conclusion of the investigation.

<u>Id.</u> at 1272.  In <u>Fujitsu</u>, liquidation of the subject entries was enjoined by order of this Court,

pursuant to 19 U.S.C. § <u>1516a</u> (c)(2), pending litigation.  <u>See</u> <u>Fujitsu General</u>, 283 F.3d 1364

(Fed. Cir. 2002).  Following the rationale in <u>Int'l Trading</u>, the <u>Fujitsu</u> court determined that, as

the liquidation was enjoined pending litigation, suspension of liquidation was removed by the

Federal Circuit ruling[19] ending the underlying litigation.  <u>Fujitu</u>, 283 F.3d at 1382.  Thus, in both

<u>International Trading</u> and <u>Fujitsu</u>, the suspension of liquidation was removed when the

mechanism by which the suspension was initiated was no longer in effect.

Here, liquidation of the Coastal Entries was suspended by statute pending the outcome of

the administrative review for the POR covering those entries.  <u>See</u> 19 U.S.C. § 1675(a).  In

accordance with <u>Int'l Trading</u> and <u>Fujitsu</u>, the suspension was removed when the act triggering

the suspension, in this case the administrative review of the Coastal Entries, concluded.

The <u>Notice of Rescission</u> concluded the review of the Coastal Entries.  The notice

unambiguously states that "[s]ince petitioner submitted timely withdrawals of its request for

review of . . . Coastal . . . the Department is rescinding its antidumping administrative review of

those companies . . . ."  <u>Notice of Rescission</u>, 67 Fed. Reg. at 50,861.  When Commerce

rescinded its review of the Coastal Entries, these entries were not suspended by statute pending

any other review[20] or by court order.  <u>See</u> 19 U.S.C. § 1504(d).  Because the <u>Notice of Rescission</u>

removed the statutory basis triggering the suspension, publication of the notice in the Federal

Register removed the suspension of the Coastal Entries.

---

[19] <u>Fujitsu Gen. Ltd., v. United States</u>, 88 F.3d 1034 (Fed. Cir. 1996) (the ruling ending the underlying litigation
during which liquidation of the subject merchandise was enjoined) ("<u>Fujitsu Gen.</u>").

[20] On November 6, 2000, Commerce had initiated a new shipper review of Coastal's entries which was to cover
entries and sales made between September 1, 1999 and August 31, 2000 upon Coastal's request.  During the course
of the review, Commerce determined that Coastal had not made entries during the period of review and therefore
rescinded the review of Coastal.  <u>Freshwater Crawfish Tail Meat from the People's Republic of China</u>, 66 Fed. Reg.
41,831 (Dep't Commerce Aug. 9, 2001) (final rescission of antidumping shipper review).  Thus, when Commerce
published the <u>Notice of Initiation</u> of the periodic administrative review on October 26, 2001, Coastal was not under
any other review.

Although the Government admits that publication of a rescission notice may, in some cases, remove the suspension of liquidation, it claims that the <u>Notice of Rescission</u> in this case did not remove the suspension.  According to the Government, as a consequence of the rescission, the Coastal Entries became tentatively subject to a PRC-wide rate once that rate was determined.  To support its position, the Government points to a footnote in the <u>Notice of Initiation</u>.  <u>See</u> 66 Fed. Reg. at 54,196 n.2 ("Footnote 2").  Footnote 2 states that if one of the listed companies, which included Coastal, "does not qualify for a separate rate, all other exporters of freshwater crawfish tail meat from the People's Republic of China who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part."  <u>Id.</u>  The Government reasons that the duties owed on the Coastal Entries were unknown and unknowable when Commerce rescinded its review of the Coastal Entries because the PRC-wide rate could not be determined until the completion of the administrative review.  Therefore, according to the Government, the <u>Notice of Rescission</u> did not remove the suspension of liquidation of the Coastal Entries.

The Government's argument that the Coastal Entries remained under review after publication of the <u>Notice of Rescission</u> is unconvincing.  In essence, the Government claims that, pursuant to a footnote in the <u>Notice of Initiation</u>, Commerce did not rescind its review of the Coastal Entries, but rather, it rescinded its review that would determine whether Coastal qualifies for a separate duty rate from the PRC.  However, the <u>Notice of Rescission</u> unambiguously states that Commerce was rescinding its review of Coastal's entries; it does not state that it is rescinding its review of Coastal as to the separate rate analysis.  Furthermore, the <u>Notice of Rescission</u> does not state or imply that Coastal did not qualify for a separate rate, a condition

precedent to deeming an exporter covered by the administrative review as part of the single PRC

entity according to Footnote 2 in the <u>Notice of Initation</u>.  Commerce never made any such

determination because it rescinded its review when the petitioner withdrew its request for review

of Coastal's entries.

The language of the <u>Notice of Rescission</u> does not indicate that a consequence of

rescission would be to subject the Coastal Entries to a PRC-wide rate.  In fact, Commerce's

statement in the <u>Notice of Rescission</u> that it "will issue appropriate assessment instructions to the

Customs Service" suggests that liquidation instructions were forthcoming and undermines

Commerce's present assertion that the notice continued the suspension of liquidation of the

Coastal Entries.  <u>See</u> 67 Fed. Reg. at 50,861.  Regardless of whether the Government intended to

continue the suspension of liquidation of the Coastal Entries by including those entries as part of

the administrative review of the PRC-wide entity, the Government's intent does not overcome

the plain meaning of the <u>Notice of Rescission</u> and the effect of that rescission as defined by 19

C.F.R. § 351.213.

Moreover, the Government's argument that the <u>Notice of Rescission</u> fails to remove the

suspension because the notice is silent as to whether the suspension is removed is meritless.

Language explicitly stating that a suspension is removed is not required to remove a suspension

of liquidation.  In <u>Int'l Trading</u>, where the court determined that the final results removed the

suspension, the final results did not explicitly state that the suspension was removed.  <u>See</u> <u>Shop</u>

<u>Towels From Bangladesh</u>, 61 Fed Reg. 5377 (Dep't of Commerce Feb. 12, 1996) (final results of

administrative review).  Likewise, in <u>Fujitsu</u>, where this Court had enjoined liquidation of the

subject merchandise pending litigation, the court held that the Federal Circuit decision ending

the underlying litigation removed the court-ordered suspension even though that decision did not even mention the suspension of liquidation that this Court had ordered.  See 283 F.3d at 1381-83.

Finally, the Government's own conduct contradicts its position.  Commerce issued liquidation instructions for the Coastal Entries in January 2003, more than three months before it completed the administrative review and issued the final results that would tentatively determine the PRC-wide rate.[21]  If liquidation of the Coastal Entries remained suspended, as the Government claims, it would be illogical, or at least premature, to issue liquidation instructions to Customs prior to publication of the final results.[22]

For the foregoing reasons, the court concludes that Commerce's publication of the Notice of Rescission in the Federal Register removed the statutory suspension of liquidation of the Coastal Entries.

**b.  Customs received notice that suspension of liquidation was removed**

Because the Notice of Rescission removed the suspension of liquidation of the Coastal Entries, the court must now determine when Customs received notice from Commerce that the suspension had been removed.  See 19 U.S.C. 1504(d); Fujistu, 283 F.3d at 1376.  For similar reasons to the determination that the Notice of Rescission removed the suspension, the court finds that publication of the Notice of Rescission in the Federal Register on August 6, 2002 also served as notification to Customs that the suspension of liquidation was removed within the

---

[21] The PRC-wide rate was not determined in the Final Results.
[22] The Government does not explain why Commerce would issue liquidation instructions for the Coastal Entries prior to the issuance of the final results if those entries were still under review, other than to state that issuing the instructions in January 2003 may have been in error.

meaning of section 1504(d).  Customs did not first receive notice at the later date when

Commerce issued liquidation instructions for the Coastal Entries or when Commerce published

the final results, as the Government claims.

    To be sufficient for purposes of section 1504(d), the notice must be unambiguous that the

suspension of liquidation has been removed.  NEC Solutions, Inc. v. United States, 411 F.3d

1340, 1344 (Fed. Cir. 2005).  In Int'l Trading, publication of the final results of the

administrative review in the Federal Register, not the later issuance of liquidation instructions,

constituted notice to Customs that suspension was removed, within the meaning of section

1504(d).  281 F.3d at 1275 (explaining that "publication in the Federal Register is a familiar

manner of providing notice to parties in antidumping proceedings" and "provides an

unambiguous and public starting point for the six-month liquidation period").

    Similarly, in this case, the publication of the Notice of Rescission in the Federal Register

served as unambiguous notice to Customs that the suspension of the Coastal Entries was

removed.  On that date, Customs received notice that the administrative review of the Coastal

Entries, the act triggering the suspension of those entries, had concluded.  The notice clearly

stated that since the petitioner submitted a timely withdrawal of its request for review of Coastal,

among others, "the Department is rescinding its antidumping administrative review of those

companies. . . . "  Notice of Rescission, 67 Fed. Reg. at 50,861.  In the case of publication of the

rescission notice at issue, like the issuance of the final results in Int'l Trading, the act removing

the suspension and the act notifying Customs of the removal, are one and the same.

         The removal of suspension of liquidation is effected by Federal Register
         publication, an act that provides general notification to affected parties regarding
         the reported action.  In that setting, there is no reason to interpret section 1504(d)

to require that notice of the removal of suspension of liquidation be provided by a mechanism separate from the act that effects the removal of suspension.

Int'l Trading, 281 F.3d at 1276.

The Government points out that the notice in Fujitsu provided Customs with an actual duty rate to be applied, whereas here, the notice does not provide a rate for the Coastal Entries. However, whether or not the notice states the specific duty rate is not the determinative factor. "To be sufficient for purposes of § 1504(d), the "notice" must be unambiguous that the suspension of liquidation has been lifted, but does not need to include specific liquidation instructions from Commerce to Customs." See NEC Solutions, 411 F.3d at 1344. The critical issue is whether Customs received unambiguous notice that the administrative review of the Coastal Entries had concluded, because the initiation of that review was the act triggering the suspension. Because the Notice of Rescission unambiguously ended the administrative review of the Coastal Entries, the publication satisfies the notice requirements under 19 U.S.C. § 1504(d).

Moreover, the Government's claim that the Notice of Rescission does not provide an actual duty rate to be applied in the liquidation instructions is misleading. The Notice of Rescission explicitly refers to Commerce's memorandum from June 2, 2002 to Customs, announcing Commerce's intent to rescind its review of Coastal's entries, among other exporters' entries. See Notice of Rescission, 67 Fed Reg. 50861.[23] The memorandum informed Customs that "the Department will assess antidumping duties for those companies, on the subject

---

[23] The Notice of Rescission cites to the Memorandum to the File from Adina Teodorescu, Case Analyst, through Barbara E. Tillman, Director, Office of AD/CVD Enforcement VII: Intent to Partially Rescind the Antidumping Administrative Review (on file in the Department's Central Records United in Room B-099 ("Memorandum of Intent to Rescind").

merchandise entered or withdrawn from the warehouse for consumption during the period of

September 1, 2000, through August 31, 2001, <u>at the cash deposit rate or bonding rate in effect on

the date of entry</u>." <u>Memorandum of Intent to Rescind</u> (emphasis added).  In the <u>Notice of

Rescission</u>, Commerce states that it provided a copy of the memorandum to all interested parties,

including Coastal, belying the Government's claim that Coastal was on notice that a failure to

qualify for a separate rate would cause it to be conditionally subject to review of the PRC-wide

entity.  <u>See</u> 67 Fed. Reg. at 50,851.  This memorandum, discussed in the <u>Notice of Rescission</u>,

clearly communicates that a consequence of the rescission would be to establish the antidumping

duty rate for the Coastal Entries at the "as entered rate."[24]

The Government's argument that the <u>Notice of Rescission</u> did not constitute section

1504(d) notice bypasses the unambiguous language of the notice clearly concluding Commerce's

review of those entries.  The Government's position that the Coastal Entries remained under

review as part of the PRC-wide entity upon rescission, pursuant to Footnote 2 in the <u>Notice of

Initiation</u>, is unpersuasive.

As an initial matter, the court finds the language of Footnote 2 ambiguous.  The

Government's interpretation presumes that Commerce was suspending the liquidation of all

entries from the PRC for the POR, regardless of whether or not a petitioner requested a review of

---

[24] The court is not ruling that Commerce's <u>Memorandum of Intent to Rescind</u> constituted notice to Customs under section 1504(d) that the suspension had been removed.  <u>See</u> <u>Travelers Indem. Co. v. United States</u>, 580 F. Supp. 2d 1330, 1334-37 (CIT 2008) (rejecting the argument that publication of the final results of an administrative review in the <u>Customs Bulletin and Decisions</u> constituted notice under section 1504(d) that the suspension of liquidation had been removed because: 1) the Bulletin is a not a familiar means of providing notice; 2) although the Bulletin is a Customs publication, knowledge of its contents cannot be imputed to the entire agency; and 3) the surety did not establish that the Bulletin provided unambiguous notice recognizable by reasonable Customs officials that suspension of liquidation had been removed.)  Rather, the court finds that publication of the <u>Notice of Rescission</u> in the Federal Register was sufficient notice to Customs for 1504(d) purposes.

those entries.  However, the plain language of Footnote 2 does not elucidate that the review

covered all entries of the subject merchandise.  Even had it done so, the Government's argument

would not overcome the plain meaning of the <u>Notice of Rescission</u>.  The Government appears to

assume that Customs somehow knew that Commerce was rescinding only its separate rate

analysis, not the review of the Coastal Entries, despite unambiguous language rescinding the

review of Coastal.  As the Government agrees, Customs' role in assessing antidumping duties is

ministerial.  <u>See</u> <u>Mitsubishi</u>, 44 F.3d at 977.  If Commerce intended to notify Customs that the

entries remained suspended, it could have stated as such, as it has done in other rescission

notices.[25]

Regardless of whether Commerce intended to continue to suspend the Coastal Entries,

the court must give effect to the language of the Federal Register notice.  <u>See</u> <u>NEC Solutions</u>,

411 F.3d at 1346 (ruling that the court looks to the content of the notice, not Commerce's intent,

in determining whether Customs has received sufficient unambiguous notice of a suspension of

liquidation had been removed).  The <u>Notice of Rescission</u> unequivocally stated that Commerce

was rescinding its review of Coastal, thereby notifying Customs that the entries were no longer

under review.  There is no conflicting language in the <u>Notice of Rescission</u> indicating that the

entries remained under review or that Commerce was rescinding its review only as to a separate-

_____

[25] In other rescission notices, where the Government rescinded only its separate rate analysis, not the administrative review of the entries, it stated as such.  <u>See, e.g.</u>, <u>New Pneumatic Off-the-Road Tires From the People's Republic of China</u>, 75 Fed. Reg. 28567, 28568 (Dep't Commerce May 21, 2010) (notice of partial rescission) (in rescinding its review as to certain entries from the PRC, the rescission notice explicitly distinguished those companies whose entries remained under review as part of the PRC entity.  The rescission notice stated that "their respective entries may be under review in the ongoing administrative review.  Accordingly, the Department will not order liquidation of entries" for those companies."  In contrast, for the other companies subject to the rescission, the notice stated that Commerce will instruct Customs to assess antidumping duties on all appropriate entries at the cash deposit rate at the time of entry.); <u>Certain New Pneumatic Off-the-Road Tires From the People's Republic of China</u>, 76 Fed. Reg. 14,919 (Dep't Commerce Mar.18, 2011) (notice of partial rescission).

rate analysis.  In fact, additional statements in the <u>Notice of Rescission</u>, announcing that "[t]he

Department will issue appropriate assessment instructions to the Customs Service,"  and

referencing the June 2, 2002 <u>Memorandum of Intent to Rescind</u> which provided Customs the

specific duty rate for the Coastal Entries, reinforce the court's determination that the rescission

notice notified Customs that the suspension of liquidation was removed within the meaning of

section 1504(d).

Therefore, the court holds that the publication of the <u>Notice of Rescission</u> removed the

suspension of liquidation of the Coastal Entries.  The publication of the <u>Notice of Rescission</u> also

constituted section 1504(d) notice to Customs that the suspension had been removed.  Because

Customs did not liquidate within six months of August 6, 2002, the date of publication, the

Coastal Entries liquidated by operation of law pursuant to section 1504(d).  The Government's

cause of action accrued six months after publication of the <u>Notice of Rescission</u> when the

Coastal Entries deemed liquidated and the Government's right to collect additional duties

attached.  <u>See</u> 19 C.F.R. § 113.62(a).  The Government failed to bring its claim within six years

after the Coastal Entries were deemed liquidated, the event triggering the Government's cause of

action.  Therefore, its right to collect any duties on the Coastal Entries is time-barred.  <u>See</u> 18

U.S.C § 2415(a).

## CONCLUSION

For the foregoing reasons, the Government's Motion for Summary Judgment is granted

in part and denied in part.  The Government's Motion for Summary Judgment is granted with

respect to the Suqian Bonds and the CEB identifying Washington International as surety.  The

Government's Motion for Summary Judgment is denied with respect to the Coastal Bonds

because the Government's right to collect any duties on the entries covered by the Coastal Bonds

is time-barred.  Great American's Cross-Motion for Summary Judgment is granted with respect

to the Coastal Bonds.  With respect to all other defenses, Great American's Cross-Motion for

Summary Judgment is denied.  Washington International's Motion for Summary Judgment is

denied.  Judgment will enter accordingly.


                                                            /s/ Richard W. Goldberg
                                                            Richard W. Goldberg
                                                            Senior Judge


Dated:            August 31, 2011
                  New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| UNITED STATES, | |
| Plaintiff, | Before:   Richard W. Goldberg, |
| | Senior Judge |
| v. | Court No.  09-00187 |
| GREAT AMERICAN INSURANCE | |
| CO. OF NY, | |
| and | |
| WASHINGTON INTERNATIONAL | |
| INSURANCE CO. | |
| Defendants. | |

<u>**JUDGMENT**</u>

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that decision, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment is granted with respect to the five single transaction bonds executed by Defendant Great American covering entries 60101412314, 60101413148,60101413031, 60101413023, and 60101415127 by PRC exporter Suqian (the Suqian Bonds); it is further

**ORDERED** that judgment is entered in favor of Plaintiff against Defendant Great American in the amount of $6,097,290.00, the combined value of the Suqian Bonds,; it is further

**ORDERED** that Plaintiff's motion for summary judgment is granted with respect to the continuous entry bond, CEB number 209802272, executed by Defendant Washington International; it is further

**ORDERED** that judgment is entered in favor of Plaintiff against Defendant Washington International in the amount of $50,000.00, the limit on the continuous entry bond executed by Defendant Washington International; it is further

**ORDERED** that Plaintiff's motion for summary judgment is denied with respect to the three single transaction bonds covering entries 60101418329 and 6010141591 by PRC exporter Coastal (the Coastal Bonds) because the Plaintiff's claims are untimely; it is further

**ORDERED** that Defendant Great American's motion for summary judgment is granted with respect to the Coastal Bonds; it is further

**ORDERED** that Defendant Great American's motion for summary judgment is denied with respect to all other defenses; and it is further

**ORDERED** that Defendant Washington International's motion for summary judgment is denied.

**SO ORDERED.**

/s/Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: August 31, 2011
       New York, New York